**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3397-21

ALEXANDER CARDILLO,

    Plaintiff-Appellant,

v.

STATE OPERATED SCHOOL
DISTRICT FOR THE
CITY OF PATERSON,
PATERSON BOARD OF
EDUCATION, EILEEN SHAFER,
M.ED, in her official capacity and
individually, MONICA FLOREZ,
in her official capacity and
individually,

    Defendants-Respondents.

_____

Argued January 24, 2024 – Decided February 29, 2024

Before Judges Currier and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0820-20.

Juan Carlos Fernandez argued the cause for appellant (Fernandez Garcia, LLC, attorneys; Michael Garcia and Juan Carlos Fernandez, of counsel and on the briefs).

Kyle J. Trent argued the cause for respondents (Apruzzese, McDermott, Mastro & Murphy, PC, attorneys; Mark J. Blunda, of counsel and on the brief; Kyle J. Trent, on the brief).

PER CURIAM

Plaintiff Alexander Cardillo appeals the April 8, 2022 order granting summary judgment in favor of defendants, the Paterson Board of Education (the Board) and the State Operated School District for the City of Paterson (the District), as well as Monica Florez and Eileen Shafer, both in their official capacities and individually, and dismissing his disability discrimination, unlawful retaliation and wrongful termination claims under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, as well as the May 27, 2022 order denying his motion for reconsideration. Because the trial court did not err in finding plaintiff failed to establish a prima facie case or that the District's reasons for terminating his employment by eliminating his position as part of a reduction in force (RIF) were pretext, we affirm.

In reviewing whether summary judgment was improvidently granted, we view the facts set forth in the record in the light most favorable to plaintiff, the non-moving party. Harz v. Borough of Spring Lake, 234 N.J. 317, 329 (2018). In doing so, we give plaintiff "the benefit of the most favorable evidence and

most favorable inferences drawn from that evidence." Gormley v. Wood-El, 218 N.J. 72, 86 (2014); see also R. 4:46-2(c).

Plaintiff worked for the District from 2015 until June 2019, when his contract to work as a library media specialist (LMS) at the Martin Luther King, Jr. School (the MLK School) was not renewed as part of a RIF. The MLK School is one of more than fifty schools in the District. While plaintiff worked at the MLK School, principal Monica Florez was his direct supervisor and Eileen Shafer was the District superintendent, to whom Florez reported. During Florez's December 18, 2018 to March 1, 2019 leave of absence, vice principal Ramona Serrano was the acting principal and plaintiff's supervisor.

During the 2018-19 school year, plaintiff began mentoring Student E,[1] a thirteen-year-old seventh-grade special education student at the MLK School who had an individualized education program (IEP) as part of his curriculum. Plaintiff asserts that at several points before and during Florez's leave of absence he met with the MLK School's special education team and reported he did not feel Student E's IEP was being adequately followed.

---

[1] We identify Student E only by his initial in accordance with the motion record and to preserve the confidentiality of the non-party minor.

A-3397-21

While Florez was on leave, Serrano received several reports concerning plaintiff's interaction with Student E, including teachers observing plaintiff alone in the library with Student E in violation of school policy. Serrano addressed these issues with plaintiff, as well as the concern plaintiff was taking Student E away from assigned in-class instruction time on a "constant" basis. In February or March 2019, Serrano instructed plaintiff to stop taking Student E out of his assigned classes. However, MLK School teachers and administrators continued to observe plaintiff disregarding Serrano's instructions and spending time alone with Student E. When Florez returned to work in March 2019, she spoke with plaintiff about the reports of his inappropriate conduct relating to Student E during her absence.

In early March 2019, a member of the MLK School staff also reported directly to Florez that they had seen inappropriate interactions between plaintiff and Student E. While in Florez's office, the staff member called the New Jersey Division of Child Protection and Permanency (DCP&P) to report the incident. At DCP&P's request and with Serrano's knowledge, Florez took steps to ensure plaintiff was not alone with Student E and advised other MLK School administrators of the same instruction during the pendency of the DCP&P

4

investigation. A school administrator was directed to be present whenever Student E was in the library with plaintiff.

Despite these efforts, plaintiff's conduct toward Student E continued, and Florez learned that while the DCP&P investigation was continuing, plaintiff purchased a McDonald's lunch for Student E, gave the lunch to him in front of other students, and continued to allow Student E into the library alone with him in the mornings before school started. Plaintiff also allowed students in his book club, including Student E, to go into the library during their scheduled lunch time. Another teacher also complained that plaintiff entered and interrupted their classroom to speak with Student E during class time. Florez again advised plaintiff these situations were inappropriate and in violation of school policies.

Plaintiff alleges that around March 2019, Florez began harassing him. According to plaintiff, he believed the harassment was retaliation because he informed school administrators he believed Student E's IEP was not being followed. Specifically, plaintiff alleges Florez followed him around the school and he was uncomfortable when Florez spoke to him about being alone with Student E. Plaintiff said Florez intensified her harassment and attacks on him each time he reported student mistreatment.

A-3397-21

During the same time period, the MLK School administrators learned that new classes of Pre-K students were being added to the MLK School student population. Some staff members' schedules had to be changed to accommodate the additional classes, the teachers' preparation periods and lunch. Since plaintiff's classification as a LMS qualified him to cover the Pre-K classes, plaintiff was assigned to assist another staff member in some of those classes. Plaintiff contends this scheduling change was accomplished while the DCP&P investigation was pending and that he was assigned to take on classes with non-communicative students with autism as punishment for reporting the harassment that Florez was subjecting him to. During this time, plaintiff informed his union representative that some Pre-K students had removed their diapers and were running around the classroom. Plaintiff told Florez the new assignment was causing him anxiety and discomfort. Florez told him "[a]ll you need to do is go in and read a book to the children."

Plaintiff asserts he has a history of depression and anxiety, for which he received treatment from medical professionals before, during, and after his employment at the MLK School. Although plaintiff contends he was "forthcoming" by advising both Florez and the school nurse of his "well-known" anxiety diagnosis, plaintiff only recounted two specific occasions during spring

2019 when he informed staff members at the MLK School of his mental health conditions.

Plaintiff contends Florez learned of plaintiff's anxiety after he experienced an incident and went to see the school nurse. The only incident in the record correlating to this description occurred in March 2019 when Florez scolded plaintiff for allowing students in the library during lunch. Plaintiff says he suffered a panic attack as a result of the scolding and had to be escorted to the school nurse's office. Plaintiff took a sick day on March 15, 2019.

Plaintiff contends that Florez would not allow plaintiff to meet privately with Shafer on March 18, 2019. On the same date, Florez instructed plaintiff to remove two students from the library, one of whom was Student E, which plaintiff felt was inappropriate.

At a meeting that same day, plaintiff told Florez that she was "the person making [him] sick," he was anxious, and he felt targeted by her. Plaintiff informed Shafer that Florez was following him around the school. Shafer replied: "I don't want you to worry about what's going on over there, [Florez] is retiring very soon and, you know, don't worry about what's happening."

Plaintiff claims that on March 19, 2019, he attempted to give Florez a "doctor's note" making it clear "he was under duress." However, Florez would

not accept the note. Plaintiff then provided the note to the school nurse and told the nurse he had an anxiety disorder and the note was to go in his file at the District's main office. Plaintiff asserts the nurse then gave the note to Florez. Florez denies ever seeing a note and testified that if she had received a note asserting an anxiety disorder, she would have given it to the District and a determination would be made if she could meet the accommodation. Plaintiff's District personnel file does not contain a document mentioning an anxiety disorder.

The note plaintiff references is a February 13, 2019 letter from social worker, Carole M. Pasahow, DSW, LCSW, stating that "Mr. Alexander Cardillo has been a patient of mine since January 2014 for treatment of anxiety and depression." Plaintiff never provided any proof that he was diagnosed with anxiety and depression by a qualified physician. Plaintiff testified he was not seeking an accommodation when he gave the note to the nurse.

On April 15, 2019, plaintiff went to the hospital for an anxiety attack. When he returned to work, he contends that Florez was standing at the front door and said: "I need your book club list." Plaintiff states that he walked around Florez and handed a secretary a doctor's note regarding his absence.

The DCP&P investigation concluded in April or May 2019. At Florez's deposition, she testified DCP&P "called to tell [her] that the case was finalized and there were no findings." Plaintiff's union representative learned of the DCP&P investigation when DCP&P officials went to Student E's house to conduct an interview. Plaintiff testified at his deposition that he learned of the then-closed DCP&P investigation on September 27, 2019.

In May 2019, the Board "eliminated hundreds of positions in the District through a [RIF] due to … [a] budgetary shortfall." The 2019 RIF was one of several RIFs that occurred in the District almost annually due to financial issues. The District's initial 2019 RIF plan called for the elimination of all nontenured LMS positions, including plaintiff's. Only three of the fifty-two schools in the District were able to keep a non-tenured LMS by substituting other positions, increasing class sizes or not filling a vacancy which existed in that school. Twelve LMS positions were among the hundreds of positions eliminated by the RIF.

The MLK School was required to eliminate three positions. Plaintiff's position was one of those that Florez recommended be eliminated, as were the positions of a second-grade teacher and a fourth-grade teacher. The District has posited there are State requirements as to how many teachers and nurses must

be kept on staff based on student population size, but no such requirement exists for the LMS position. Additionally, "[p]laintiff's schedule had the most open spaces and he covered significantly [fewer] classes than any other non-tenured staff member."

After Florez submitted a recommended plan for accomplishing the RIF at the MLK School, the Board voted to accept the proposal and eliminate the LMS position. Plaintiff was notified that his employment contract for the following year was not being renewed and his employment officially ended in June 2019.

Plaintiff argues that Florez unilaterally made the decision as to which positions to eliminate and that the Board, in retaining three LMS positions in the District with less seniority than him, improperly applied District Policy 3146, which states, in part: "When two or more nontenured teaching staff members are employed within the category affected by a [RIF], the nontenured teaching staff member(s) shall be retained in that category who has demonstrated greater competence."

Neither plaintiff nor his union representative filed a grievance or petition regarding his non-renewal and plaintiff did not request a hearing before the Board. Plaintiff also did not file a grievance or complaint with the District's

Affirmative Action Office or human resources department claiming harassment or discrimination while employed by the District.

On March 11, 2020, plaintiff filed an eight-count complaint alleging the following: disability discrimination in violation of the LAD (count one); negligent supervision and training (count two); respondeat superior (count three); hostile work environment in violation of the LAD (count four); aiding and abetting as to Florez (count five); retaliation (count six); wrongful termination (count seven); and aiding and abetting as to Shafer (count eight). After discovery concluded, defendants filed a motion for summary judgment. On April 8, 2022, the court granted defendants' motion and dismissed the entirety of the complaint with prejudice for the reasons set forth in a written decision.

The trial court found plaintiff had failed to present an opinion from an expert that he had a disability recognized under the LAD and, therefore, plaintiff had not set forth a prima facie case of disability discrimination. Further, the trial court rejected plaintiff's retaliation claims as unsubstantiated, unrelated to any adverse employment actions, and without a causal link to any alleged protected activities. The trial court also concluded plaintiff did not establish he was engaged in LAD-protected activities, he lacked standing to bring a case on

11

behalf of a special-needs student, and he improperly failed to exhaust administrative remedies as to his wrongful termination claim.

On May 27, 2022, the court denied plaintiff's motion for reconsideration finding that plaintiff had not met the standard set forth in D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990), to warrant reconsideration of a final order. On reconsideration, the trial court found that plaintiff did not set forth a prima facie claim for discriminatory discharge since he did not establish that his LMS position was filled by someone else after the RIF. Although in reply to opposition to his motion for reconsideration, plaintiff did supply the court with copies of an advertisement for a District job fair in which the LMS position was listed as one of the positions being hired for, the court stated it did not consider any additional evidence submitted on the reconsideration motion that could have been provided in opposition to defendants' summary judgment motion.

The trial court also found that plaintiff failed to establish causation since plaintiff admitted it was his belief Florez took action against him for his relationship with Student E, not as the result of disability discrimination. The trial court found plaintiff only mentioned an allegation that he was retaliated against for complaining that Pre-K students with autism were being treated improperly in a conclusory fashion by way of counsel's argument in opposition

12

to summary judgment without making the allegation anywhere in his complaint. Finally, the trial court found on reconsideration that plaintiff did not establish any evidence of pretext under the McDonnell Douglas[2] burden-shifting framework. This appeal followed.

On appeal, plaintiff argues the trial court erred in finding he had not established he had a disability nor that he was advocating on behalf of those with disabilities. Further, plaintiff alleges the trial court improperly relied on evidence not established in the record to grant summary judgment and that he has standing to bring each of the claims in his eight-count complaint. Plaintiff additionally asserts that the trial court incorrectly found the elimination of his position resulting from a District-wide RIF was not pretextual.

We review a trial court's grant or denial of a motion for summary judgment de novo, applying the same standard applied by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). As a result, we are tasked with determining """whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.""" C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305 (2023)

---

[2] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

(quoting Samolyk, 251 N.J. at 78) (quoting Brill v. Guardian Life Ins Co. of Am., 142 N.J. 520, 540 (1995)).

We broadly construe and apply the protections of the LAD to allow for the greatest available antidiscrimination impact. Richter v. Oakland Bd. of Educ., 246 N.J. 507, 537 (2021). "The LAD's worthy purpose is no less than eradication of '"the cancer of discrimination" in our society.'" Ibid. (quoting Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016) (quoting Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 115 (2010))).

In a discrimination claim under the LAD, it is the plaintiff who bears the burden to establish a prima facie case. Victor v. State, 203 N.J. 383, 408 (2010). To succeed in proving a prima facie case, the evidentiary burden is "'rather modest.'" Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)). It is sufficient that the plaintiff is able "to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent – i.e., that discrimination could be a reason for the employer's action." Ibid. (emphasis omitted) (quoting Marzano, 91 F.3d at 508).

Given that claims under the LAD are to be interpreted broadly and the standard for summary judgment requires facts to be viewed in the light most

A-3397-21

favorable to the non-moving party, the trial court's task is not to determine the strength of the case, but rather if plaintiff's "allegations, if true, can establish that defendant[] violated the LAD." Beneduci v. Graham Curtin, P.A., 476 N.J. Super. 73, 82 (App. Div. 2023). "Rather than considering each incident in isolation, courts must consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'" Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 607 (1993) (quoting Burns v. McGregor Elec. Indus. Inc., 955 F.2d 559, 564 (8th Cir. 1992)).

For plaintiff to succeed in demonstrating that he was improperly discharged because of his disability, he must establish the four factors set forth in Viscik v. Fowler Equipment Co., 173 N.J. 1, 14 (2002):

> that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person.

We turn first to the trial court's determination that plaintiff failed to establish that he was disabled pursuant to the standards set forth by our LAD decisional law. The trial court found plaintiff must establish a prima facie

showing of a disability by way of expert opinion as a prerequisite to the viability of counts one (disability discrimination in violation of the LAD), four (hostile work environment in violation of the LAD), and five (aiding and abetting as to Florez). We affirm the trial court and add that establishing a disability is also dispositive as to count eight (aiding and abetting as to Shafer).

Plaintiff argues that the trial court's determination that he failed to establish a disability was predicated on the erroneous conclusion that he failed to produce expert medical testimony. Plaintiff claims he did provide expert testimony, but the court discredited it after improperly making credibility and validity determinations in place of the trier of fact.

Under the LAD, an employee who has a disability is a member of a protected class. N.J.S.A. 10:5-12. Disability is defined in the LAD under N.J.S.A. 10:5-5(q). "Pursuant to N.J.S.A. 10:5-5(q), there are two specific categories of handicap: physical and non-physical. The physical and non-physical clauses of the statute are distinct from each other and provide separate ways of proving handicap." Viscik, 173 N.J. at 15. "To meet the physical standard, a plaintiff must prove that he or she is (1) suffering from physical disability, infirmity, malformation or disfigurement (2) which is caused by bodily injury, birth defect or illness including epilepsy." Ibid.

16

To meet the non-physical standard, a plaintiff must prove that he or she is suffering (1) from any mental, psychological or developmental disability (2) resulting from an anatomical, psychological, physiological or neurological condition that either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

[Id. at 16.]

"Where the existence of a handicap is not readily apparent, expert medical evidence is required. Accordingly, courts place a high premium on the use and strength of objective medical testimony in proving the specific elements of each test contained in the statute." Ibid. (internal citations omitted).

The trial court found that plaintiff alleged in response to the summary judgment motion he had two disabilities: high blood pressure[3] and anxiety. Under the standards set forth in Viscik, 173 N.J. at 15-16, the court determined that high blood pressure and anxiety are not disabilities that are readily apparent and, therefore, expert testimony was required.

On appeal, plaintiff asserts there is "ample, competent evidence" of his disability in the record based on the note, which lacks a diagnosis from a qualified physician, and contains a conclusory sentence stating plaintiff "has

---

[3] Plaintiff does not argue on appeal that high blood pressure is a disability.

been a patient of [hers] since 2014 for treatment of anxiety and depression." In deciding the summary judgment motion, the trial court recognized the note was the only "unverified" evidence in the record proffered on this issue.

We conclude the trial court did not err in concluding the note was not expert testimony sufficient to establish a disability under the LAD. Since "psychiatric diagnoses are generally outside the competence of psychiatric social workers, appellate courts have sustained the discretion of trial courts that excluded such testimony." State v. Zola, 112 N.J. 384, 422 (1988) (emphasis omitted). Additionally, pursuant to Viscik, 173 N.J. at 16, the note fell short of establishing plaintiff's anxiety "either (a) prevents the normal exercise of any bodily or mental functions or (b) is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." The single substantive sentence in the note fails to meet these standards and does not address any function that plaintiff's anxiety prevents him from undertaking or the demonstrability of plaintiff's anxiety. The note does not contain an actual diagnosis from a qualified expert predicated on facts but rather merely sets forth in generic terms that there was treatment.

We find no error in the trial court's conclusion that plaintiff has not established a prima facie showing that he has a disability under the LAD. This

is sufficient basis alone to affirm the trial court's order dismissing all claims contingent on plaintiff establishing membership in a protected class under the LAD – counts one, four, five, and eight.

Next, we turn to plaintiff's argument that the trial court improperly dismissed all claims for retaliation against plaintiff for LAD-protected activities contained in counts two (negligent supervision and training), three (respondeat superior), and six (retaliation).

"[A] person engages in protected activity under the LAD when that person opposes any practice rendered unlawful under the LAD." Young v. Hobart W. Grp., 385 N.J. Super. 448, 466 (App. Div. 2005); see also Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990).

> [T]he prima facie elements of a retaliation claim under the LAD requires plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence.
>
> [Victor, 203 N.J. at 409.]

Plaintiff asserts that his "advocacy for special needs students" constitutes a protected activity under the LAD, and, therefore, any retaliation for those

A-3397-21

actions is unlawful. Even if plaintiff's conduct was a protected activity, we nonetheless affirm the trial court's dismissal of counts two, three, and six since plaintiff has failed to produce prima facie evidence of a causal nexus.

As part of establishing a prima facie case, a LAD claimant must demonstrate "there is a causal link between the protected activity and the adverse employment consequence." Ibid. "[C]ausal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive." Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995). There is "no case that stands for the proposition that proximity is the only circumstance that justifies an inference of causal connection." Ibid.

The only proffered adverse employment action in the record is the elimination of the LMS position that plaintiff held as a non-tenured District employee through the mandatory RIF. On reconsideration, the trial court found that "pretext cannot exist without causation" and there was "was no showing in the [original] motion how the RIF's financial considerations were retaliatory." We agree that plaintiff failed to establish prima facie evidence of a causal relationship between any disability or LAD-protected activity and the elimination of the LMS position.

The only evidence in the record as to the reason for the elimination of the LMS position that plaintiff held was the RIF. No intention to discriminate against plaintiff through adverse employment action was proffered or demonstrated. The undisputed evidence in the motion record established that plaintiff's position was eliminated under the RIF, along with hundreds of other District employee contracts that were not renewed as the result of budgetary constraints. We agree that plaintiff failed to proffer prima facie evidence of causation.

While we conclude the trial court properly found that plaintiff did not establish a prima facie LAD case and the analysis could end there, we also agree with the trial court's determination that plaintiff failed to present evidence defendants' proffered reasons for the employment action were pretext to obscure true discriminatory intentions towards plaintiff. Under McDonnell Douglas, after the defendant has shown "a legitimate nondiscriminatory reason for its decision," "the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application." Dixon v. Rutgers, The State Univ. of N.J., 110 N.J. 432, 442 (1988).

21

To guide the liberal application of the LAD, New Jersey has adopted the "procedural burden-shifting methodology" set forth in McDonnell Douglas, 411 U.S. at 802-04. Under this burden-shifting analysis,

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Henry v. N.J. Dep't of Hum. Servs., 204 N.J. 320, 331 (2010) (quoting Dixon, 110 N.J. at 442).]

For the same reasons plaintiff did not establish causation, we find the record lacking in evidence of pretext. The only evidence in the record as to the elimination of the LMS position at the MLK School was that it was accomplished under a mandatory RIF. The LMS position was one of three jobs at the MLK School eliminated by the RIF, which included two elementary school teachers. Plaintiff also does not refute defendants' submission that, although the state requires a certain number of teachers and nurses at each school, no such requirement exists for the LMS position. Also undisputed is that the elimination of plaintiff's LMS position had the least disruptive impact on the student population because he led fewer individual classes than other non-tenured positions.

Plaintiff's assertion that there were non-tenured employees holding LMS positions in the District whose contracts were renewed despite having less experience than him is not supported by any evidence in the record. Conversely, defendants point to evidence in the record that twelve LMS positions in the District were eliminated as part of the RIF, in addition to hundreds of other staff positions. Plaintiff's assertion at oral argument before us that the District has since rehired for his position is not substantiated by any proofs in the record before the trial court. See Scott v. Salerno, 297 N.J. Super. 437, 447 (App. Div. 1997).

We conclude the legitimate reason for the reassignment of plaintiff to newly added Pre-K classrooms is not disputed by any competent evidence in both motion records. We also reject plaintiff's argument that the non-party DCP&P investigation was a fiction created by defendants to justify separating plaintiff from Student E and changing his classroom assignment.

Despite acknowledging that he learned of the DCP&P investigation in September 2019 and his union representative learned of the investigation when DCP&P visited Student E at home, plaintiff makes the unsupported argument that Florez fabricated the existence of any investigation in order to generate a pretextual reason for his termination. This unsupported belated assertion does

not create a genuine question of material fact as to pretext. DCP&P investigations are confidential and plaintiff had no right to notification from defendants and, in fact, advising plaintiff would be contrary to statute. N.J.S.A. 9:6-8.10a(a).

Even under the liberal application of the LAD, "[t]o prove pretext . . . a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent." Viscik, 173 N.J. at 14. Plaintiff did not present any facts in the record evidencing a discriminatory intent by defendants or their representatives. Accordingly, we see no error in the trial court's conclusions that plaintiff has failed to produce evidence to raise a genuine issue of pretext. We affirm the trial court in dismissing counts two, three, and six.

Although we find plaintiff's remaining arguments lack merit, we will nonetheless briefly address each one in turn. We substantially agree with the trial court's determination that in order for Shafer or Florez to be liable individually and in the official capacities, as alleged in counts five and eight the District must first be found liable. See Cicchetti v. Morris Cnty. Sheriff's Off., 194 N.J. 563, 594 (2008). Since the District is not liable under the LAD, we

24

shall not disturb dismissal of the aiding and abetting claims against the individual defendants.

As to count seven, the trial court found plaintiff's claim for wrongful termination pursuant to New Jersey's Education Law (NJEL), N.J.S.A. 18A:1-1 to 76-4, was not within the jurisdiction of the Law Division and could only be adjudicated by the Commissioner of Education. See Campione v. Adamar, Inc., 155 N.J. 245, 261 (1998). Plaintiff clarified on appeal that this litigation only seeks relief for LAD-based claims that are not cognizable in a wrongful termination action filed with the Commissioner. Thus, we affirm the dismissal of plaintiff's wrongful termination claim pursuant to our LAD-based analysis.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3397-21